J. MICHAEL BOYD, administrator,[1] vs. NATIONAL RAILROAD PASSENGER CORPORATION[2] & others.[3]

No. 03-P-312.

Suffolk. May 12, 2004. - January 20, 2005.

Present: GRASSO, DREBEN, & SMITH, JJ.

Further appellate review granted, 444 Mass. 1106 (2005).

*Wrongful Death. Railroad. Negligence,* Wrongful death, Railroad, Trespasser, Violation of statute. *Statute,* Construction, Federal preemption. *Evidence,* Safety improvements. *Wilful, Wanton, or Reckless Conduct.*

In a civil action arising out of the death of a minor struck and killed by a train at a railroad crossing, in which the plaintiff, the decedent's father, brought wrongful death claims against the railroad, the Massachusetts Bay Transportation Authority, and the engineer of the train, the judge properly concluded that where the decedent bicycled around a lowered safety gate, which blocked entrance to the crossing, and on to the rail tracks, she violated G. L. c. 160, § 218, and her presence on the tracks at the time of the accident was thus "contrary to law," as that phrase is interpreted under G. L. c. 229, § 2, precluding the plaintiff from recovering under a negligence theory against all three defendants [788-790]; similarly, the decedent's illegal entry on to the tracks barred the plaintiff from recovering on wrongful death claims predicated on statutory violations of G. L. c. 160, §§ 138 (failure to properly sound train's bells and whistles) and 232 (failure to give proper signals) against the railroad and the Massachusetts Bay Transportation Authority. [790-791]

In a civil action on behalf of a minor struck and killed by a train at a railroad crossing, in which the plaintiff, the decedent's father, brought a wrongful death claim predicated on wilful, wanton, or malicious conduct against the railroad and the Massachusetts Bay Transportation Authority, the judge properly granted summary judgment in favor of the defendants, where the plaintiff's claims regarding the adequacy of the warning devices at the crossing were preempted by Federal law, and where certain evidence concerning the defendants' knowledge that children were walking and bicycling around lowered safety gates at other crossings was protected from disclosure by 23 U.S.C. § 409, and thus the only remaining admissible evidence to support the defendant's claim (specifically, that the engineer of the train failed to sound the horn in compliance with regula-

---

[1]Of the estate of Kelly Ann Boyd.

[2]Doing business as and also known as Amtrak.

[3]Massachusetts Bay Transportation Authority and Richard Prone.

tions, and that the speed of the train exceeded the Federal speed limit, a claim not preempted by Federal law), standing alone, was at best evidence of negligence and did not warrant a finding of wanton or reckless conduct. [791-798]

CIVIL ACTION commenced in the Superior Court Department on September 13, 1999.

A motion for summary judgment was heard by *Diane M. Kottmyer*, J., and a motion for reconsideration was considered by her.

*John B. Flemming (Joseph P. Musacchio* with him) for the plaintiff.

*David T. Mitrou* for the defendants.

SMITH, J. On June 24, 1998, fifteen year old Kelly Ann Boyd was struck and instantly killed by a train at the Pine Street grade crossing in Abington. On September 13, 1999, Kelly's father, J. Michael Boyd (the plaintiff), commenced a wrongful death action in Superior Court against the National Railroad Passenger Corporation (Amtrak), the Massachusetts Bay Transportation Authority (MBTA), and the train's engineer, Richard Prone. Specifically, the complaint alleged (1) wrongful death claims predicated on negligence against Amtrak, the MBTA, and Prone; (2) wrongful death claims predicated on statutory violations against Amtrak and the MBTA; and (3) wrongful death claims predicated on gross negligence and wilful, wanton, or reckless conduct against Amtrak and the MBTA.

After discovery by both sides, the defendants filed a motion for summary judgment which was allowed by a Superior Court judge on May 24, 2002. In the judge's extensive and well-reasoned decision, she concluded that Kelly was on the rail tracks at the Pine Street crossing "contrary to law," as that phrase is interpreted under G. L. c. 229, § 2, precluding the plaintiff from recovering under a negligence theory. The judge also ruled that Kelly was on the tracks "in violation of the law" under G. L. c. 160, § 218, barring the plaintiff from recovery under G. L. c. 160, §§ 138 and 232. Furthermore, the judge dismissed the plaintiff's wrongful death claims predicated on wilful, wanton, or reckless conduct. Judgment entered for the defendants on May 29, 2002.

On appeal, the plaintiff claims the motion judge erred in holding that Kelly was on the tracks "contrary to law" and "in violation of the law." He also argues that the judge erroneously ruled that certain of the plaintiff's claims were preempted, that certain evidence would be inadmissible at trial, and that the remaining evidence was insufficient as matter of law to establish wilful, wanton, or reckless conduct.

*Facts.* The materials before the judge, viewed in the light most favorable to the plaintiff, established the following material facts.

The MBTA contracts with Amtrak to operate the Old Colony railroad line. Commuter rail service on the line resumed in September of 1997 after approximately thirty-eight years of nonuse. In rebuilding the Old Colony line, the MBTA applied for and received federal funds, and the line was rebuilt in compliance with the design and construction requirements of the Federal Railroad Administration. In rebuilding the Old Colony line, the MBTA recognized that the public was not accustomed to high-speed trains traveling through their communities and that grade crossings presented safety issues. In 1996, the Legislature enacted St. 1996, c. 151, § 648, which provides: "[A]ll grade crossings to be constructed on the Old Colony [line] shall be guarded by two drop gates on each side of the tracks sufficient to prevent automobile traffic from crossing the tracks when the gates are down."

Before reopening the Old Colony line, the MBTA did not install the legislatively mandated four-quadrant gates, in which two automatic entrance gates serve as a barrier for approach lanes and two additional automatic exit gates serve as a barrier to vehicles trying to circumvent the primary entrance gates. Instead, after the line began operating, the MBTA used a Federal grant to contract with LS Transit Systems to conduct a corridor analysis of the forty-four grade crossings along the line. The purpose of the corridor analysis was to evaluate safety enhancements for the crossings, including a study of the use of four-quadrant gates. As part of the study, surveillance cameras were installed in May of 1998 at crossings in Kingston and Halifax, and at the Wales Street crossing in Abington, to observe the existing warning and safety systems and the public's behavior

at the crossings. Between May 26 and June 8, 1998, the surveillance tape at the Wales Street crossing showed four incidents of bicyclists and one incident of a pedestrian passing around lowered gates when the warning systems were activated.

The Pine Street grade crossing in Abington is a double-track crossing with a main track and a passing siding.[4] The crossing is equipped with automatic safety gates, warning bells, and warning lights. The design and construction plans for the crossing, including the warning devices, were submitted to and approved by the Federal Department of Public Utilities/Department of Telecommunications and Energy in accordance with 23 C.F.R. § 646.214(b) (1996).

On June 24, 1998, at 1:48 P.M., Kelly was struck and killed by a commuter train operated by defendant Prone at the Pine Street grade crossing. According to a motorist who witnessed the accident while stopped at the grade crossing, Kelly was riding her bike in the same direction he was traveling. A southbound train went through the crossing on the east side of the track at a "slow" or "normal" rate of speed. After the train passed, Kelly rode her bicycle behind the witness's car, and then proceeded around the lowered safety gate. She looked to the right and the left down the tracks, and then began to cross the northbound track. The witness testified that the whistles were sounding on both trains constantly. A fast-moving northbound train struck Kelly as she reached the middle of the first track. The train's whistle, bell, and lights were found to be in working order, as was the remainder of train.

Prone gave somewhat inconsistent statements to Abington, State, and MBTA police officers, as well as to Amtrak investigators. The substance of his statements is that the train he was operating was proceeding northbound and had just passed a southbound train when he noticed a young girl coming from the west side of Pine Street traveling east. The safety gates were down and the lights were flashing. Prone claimed to have blown the horn for ten to fifteen seconds before impact, although Amtrak reported that Prone was not blowing the horn in the pattern required for the crossing area. Prone applied the

---

[4]Passing sidings appear to be double tracks that enable high-speed trains to meet and pass in opposite directions, in contrast to a single-track design.

emergency brakes before he hit Kelly. In his statements to Amtrak investigators and Abington police Officer Robert O'Keefe, Prone claimed to have initiated the emergency application of brakes about 300 feet before the point of impact, while in his statement to State police officers, he claimed to have applied the brakes 200 feet before the point of impact.

Records from the train's event recorder[5] indicated that as the train approached the Pine Street crossing, Prone had been "feathering" the horn, which meant that the horn was not sounding very much, but the records also indicated that just before the accident, the train horn was sounding continuously for five to six seconds. According to Prone, there is a "W/MX" sign south of the Pine Street crossing which indicates to engineers that there are numerous crossings ahead and that the train's whistle should be sounded at each designated crossing. NORAC[6] rules require a pattern of two long whistles, followed by a short whistle and a final long whistle, and provide that in accordance with a "W/MX" sign, an engine whistle or horn signal must be prolonged or repeated until the last of the multiple crossings is passed. Here, after passing through the Wales Street crossing in Abington, Prone stopped blowing the whistle for several seconds before sounding it again as he approached Pine Street.

Pursuant to 49 C.F.R. § 213.9(a) (1997), the maximum allowable speed for this type of train on this type of track is 80 miles per hour (mph), although the MBTA and Amtrak had set a more stringent maximum speed of 70 mph for the Old Colony line. Prone told State police officers that he had been operating the train at 70 mph, but the event recorder indicated that the train had been operating at speeds of up to 78 mph and that when Prone applied the emergency brakes, the train had been traveling at 75 mph. The event recorder also indicated that the train was traveling at approximately 78 mph for ten seconds before it approached the Pine Street crossing. According to an Amtrak supervisor, however, the actual speed of the train could

---

[5]An event recorder is the railroad equivalent of an airplane's "black box." *Macfarlane* v. *Canadian Pac. Ry. Co.*, 278 F.3d 54, 62 (2d Cir. 2002).

[6]Northeast Operating Rules Advisory Committee.

have been over 80 mph. An outside expert, a consultant specializing in traffic and train accident reconstruction and highway safety, testified that where the event recorder showed a speed of 78 mph, the train's actual speed was 92 mph, and that where the event recorder showed a speed of 75 mph (when the emergency brakes were applied), the train's actual speed was 88 miles per hour.

According to an Amtrak report, Prone was exceeding the maximum authorized speed while operating the train, and the event recorder data revealed that at three crossings earlier that day, he had not sounded his engine whistle in compliance with NORAC rules. Prone was suspended for thirty days for these violations in accordance with his union contract.

*Discussion.* In ruling on a motion for summary judgment, "a judge . . . must consider 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' in determining whether summary judgment is appropriate. Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). The burden on the moving party is to 'show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' *Id.*" *Madsen* v. *Erwin,* 395 Mass. 715, 719 (1985). "This burden need not be met by affirmative evidence negating an essential element of the plaintiff's case, but may be satisfied by demonstrating that proof of that element is unlikely to be forthcoming at trial." *Flesner* v. *Technical Communications Corp.,* 410 Mass. 805, 809 (1991). See *Kourouvacilis* v. *General Motors Corp.,* 410 Mass. 706, 716 (1991).

The plaintiff's wrongful death claims were predicated on the defendants' negligence, statutory violations, and wilful, wanton, or reckless conduct. Under G. L. c. 229, § 2, a wrongful death claim may be brought against someone who, by his negligence, causes the death of a person, or against someone who, by his wilful, wanton, or reckless conduct, causes the death of another.

1. *Wrongful death based on negligence.* General Laws c. 229, the wrongful death statute, has a specific exception applicable

to railroads.[7] Section 2 of the statute provides: "a person operating a railroad shall not be liable for negligence in causing the death of a person while walking or being upon such railroad *contrary to law* or to the reasonable rules and regulations of the carrier" (emphasis added). G. L. c. 229, § 2, as appearing in St. 1973, c. 699, § 2. The statute applies even where the injured person is a child. *Jad* v. *Boston & Me. Corp.*, 26 Mass. App. Ct. 564, 570-571 (1988). Thus, in this case, the defendants' liability to the plaintiff for Kelly's wrongful death, predicated on their negligence, depends upon whether Kelly was on the railroad tracks "contrary to law."

Under Massachusetts law, it is a crime to be on railroad tracks except at an established crossing. G. L. c. 160, § 218. See *Gage* v. *Westfield*, 26 Mass. App. Ct. 681, 690 (1988). See also *Beausoleil* v. *Massachusetts Bay Transp. Authy.*, 138 F. Supp. 2d 189, 197-198, 199 (D. Mass. 2001). The plaintiff argues that Kelly's presence on the tracks was not contrary to law, because she was on a highway or authorized grade crossing when she was struck, and the statute provides an exception in those circumstances. G. L. c. 160, § 218. We are unpersuaded by this argument, which appears to contravene common sense and the statutory purpose. General Laws c. 160, § 218, expressly prohibits all manner of trespass on railroad property and, implicitly, the presence of unauthorized persons when the approach of a train is imminent, i.e., when the gates are lowered blocking entrance to the crossing. See *Gage* v. *Westfield*, 26 Mass. App. Ct. at 690. See generally *Dole* v. *Boston & Me. R.R.*, 308 Mass. 46, 50 (1941) ("It is well settled that a railroad in the operation of its trains has exclusive use of a grade crossing while they are passing over it") (citation omitted).

Violation of G. L. c. 160, § 218, suffices to implicate the railroad exception of the wrongful death statute. See *Beausoleil* v. *Massachusetts Bay Transp. Authy.*, 138 F. Supp. 2d at 199-200; *Corrado* v. *New York, New Haven & Hartford R.R.*, 333 Mass. 417, 418-419 (1956); *Jad* v. *Boston & Me. Corp.*, 26 Mass. App. Ct. at 570-571; *Gage* v. *Westfield*, 26 Mass. App.

---

[7]For an analysis of the purpose and statutory history of the railroad exception, which dates back to 1853, see *Owen* v. *Meserve*, 381 Mass. 273, 276-277 (1980), cert. denied, 449 U.S. 1082 (1981).

Ct. at 690. This is true even when a railroad defendant has reason to anticipate that persons might be on the tracks at a particular location. *Beausoleil* v. *Massachusetts Bay Transp. Authy.*, 138 F. Supp. 2d at 199-200; *McConville* v. *Massachusetts Bay Transp. Authy.*, 852 F. Supp. 1, 2 (D. Mass. 1994); *Gage* v. *Westfield*, 26 Mass. App. Ct. at 690.

Here, when Kelly bicycled around the lowered safety gate, which blocked entrance to the crossing, and on to the rail tracks, she was violating G. L. c. 160, § 218. Her presence on the tracks at the time of the accident was thus "contrary to law." Accordingly, the railroad exception to liability is applicable and the motion judge properly dismissed the plaintiff's wrongful death claims predicated on negligence against Amtrak, the MBTA, and Prone.

2. *Wrongful death based on statutory violations.* The defendants moved for summary judgment on the plaintiff's wrongful death claims predicated on violations of G. L. c. 160, § 138 (failure to properly sound train's bells and whistles), and § 232 (railroad liable for collisions if proper signals are not given), which are reprinted in the margin.[8] The judge dismissed

---

[8]General Laws c. 160, § 138, states: "Every railroad corporation shall cause a bell of at least thirty-five pounds in weight, and a whistle, to be placed on each locomotive engine passing upon its railroad; and such bell shall be rung or at least three separate and distinct blasts of such whistle sounded at the distance of at least eighty rods from the place where the railroad crosses upon the same level any public way or traveled place over which a signboard is required to be maintained as provided in sections one hundred and forty and one hundred and forty-one; and such bell shall be rung or such whistle sounded continuously or alternately until the engine has crossed such way or traveled place." G. L. c. 160, § 138, as appearing in St. 1941, c. 273, § 2.

General Laws c. 160, § 232, provides: "If a person is injured in his person . . . by collision with the engines or cars or rail-borne motor cars of a railroad corporation at a crossing such as is described in section one hundred and thirty-eight, and it appears that the corporation neglected to give the signals required by said section or to give signals by such means or in such manner as may be prescribed by orders of the department, and that such neglect contributed to the injury, the corporation shall be liable for all damages caused by the collision, or, if the life of a person so injured is lost, to damages recoverable in tort, as provided in section two of chapter two hundred and twenty-nine, unless it is shown that, in addition to a mere want of ordinary care, the person injured or the person who had charge of his person or property was, at the time of the collision, guilty of gross or wilful negligence, or was

the plaintiff's wrongful death claim based on violations of §§ 138 and 232.[9]

Failure to provide the statutory signals creates liability in the railroad irrespective of negligence, unless the special defense set forth in § 232 is shown, i.e., unless the railroad can show that the injured person was on the tracks in violation of the law. See *Mannino* v. *Boston & Me. R.R.*, 300 Mass. 71, 74 (1938). A violation of § 218, which criminalizes the act of being on railroad tracks except at established crossings, bars a plaintiff from recovering under the plain language of § 232. Cf. *Borden* v. *New York, New Haven & Hartford R.R.*, 339 Mass. 266, 268-269 (1959) (motorist's violation of G. L. c. 90, § 15, precludes recovery under § 232).

As discussed *supra*, Kelly's entry on to the railroad tracks when the gates were lowered violated § 218. Thus, the plaintiff could not recover under § 232. Accordingly, the defendants were entitled to judgment on the plaintiff's wrongful death claims against Amtrak and the MBTA alleging statutory violations.[10]

3. *Wrongful death based on wilful, wanton, or reckless conduct.* As stated *supra*, a wrongful death claim can be brought against someone who, through wilful, wanton, or reckless conduct, causes the death of another. G. L. c. 229, § 2. To show the defendants' wilful, wanton, or reckless conduct, the plaintiff points to evidence that the train's speed was in excess of 70 mph, that four-quadrant gates had not been installed as required by Massachusetts law, St. 1996, c. 151, § 648, and that the defendants failed to act in spite of their knowledge that children were walking and bicycling around lowered safety gates to cross the tracks at other crossings on the Old Colony line.

---

acting *in violation of the law*, and that such gross or wilful negligence or unlawful act contributed to the injury" (emphasis added). G. L. c. 160, § 232, as appearing in St. 1958, c. 238, § 9.

[9]In a subsequent motion for reconsideration, the judge struck from her memorandum of decision on the defendants' motion for summary judgment the specific finding that Prone's failure to sound the horn did not proximately cause Kelly's death.

[10]Prone's violation of G. L. c. 160, § 138, is considered in connection with the plaintiff's wrongful death claim predicated on wilful, wanton, and reckless conduct, *infra*.

The motion judge held that Amtrak and the MBTA were not liable for wilful, wanton, or reckless conduct, specifically ruling that (a) local speed limit and gate requirements are preempted by Federal law; (b) 23 U.S.C. § 409 (1994 & Supp. III 1998) protects from discovery or admission in evidence documents related to the defendants' knowledge of children going around the safety gates; and (c) the remaining admissible evidence produced by the plaintiff was insufficient to prove wilful, wanton, or reckless conduct.

a. *Federal preemption.* The Federal Railroad Safety Act (FRSA), 49 U.S.C. §§ 20101 et seq. (1994), Pub. L. 103-272, § 1(e), 108 Stat. 863 et seq., was enacted to promote safety in all areas of railroad operations and to reduce railroad-related accidents and incidents. See 49 U.S.C. § 20101; *CSX Transp., Inc.* v. *Easterwood,* 507 U.S. 658, 661 (1993). The FRSA gives the United States Secretary of Transportation broad powers to prescribe regulations and issue orders for all areas of railroad safety. See 49 U.S.C. § 20103(a); *CSX Transp., Inc.* v. *Easterwood,* 507 U.S. at 662.

The FRSA contains an express Federal preemption provision. See 49 U.S.C. § 20106 ("A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement"); *CSX Transp., Inc.* v. *Easterwood, supra.* The preemption provision, however, contains a savings clause indicating that a State may adopt or continue in force an additional or more stringent law, regulation, or order when it "is necessary to eliminate or reduce an *essentially local safety hazard*" (emphasis added). 49 U.S.C. § 20106(1). *CSX Transp., Inc.* v. *Easterwood, supra.* The savings clause relates to specific local hazards that are "aberrations," involving factors that the Secretary of Transportation did not and, as a practical matter, could not take into account in determining laws or regulations under the FRSA. See *Armstrong* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 844 F. Supp. 1152, 1153 (W.D. Tex. 1994); *O'Bannon* v. *Union Pac. R.R. Co.,* 960 F. Supp. 1411, 1420 (W.D. Mo. 1997). Cases where Federal law has not preempted state law center around the duty to avoid "a specific collision." See *Armstrong* v. *Atchi-*

*son, Topeka & Santa Fe Ry. Co.*, 844 F. Supp. at 1153; *Beausoleil v. National R.R. Passenger Corp.*, 145 F. Supp. 2d 119, 121 (D. Mass. 2001).

The individual, local hazard cannot be Statewide in character and cannot be capable of being adequately encompassed within uniform, national standards. See *United Transp. Union* v. *Foster*, 205 F.3d 851, 861 n.18 (5th Cir. 2000); *Bowman* v. *Norfolk S. Ry. Co.*, 832 F. Supp. 1014, 1017-1018 (D.S.C. 1993), aff'd, 66 F.3d 315 (4th Cir. 1995); *O'Bannon* v. *Union Pac. R.R. Co.*, 960 F. Supp. at 1420-1421. Moreover, general knowledge of a chronically dangerous condition at a particular crossing does not constitute the type of individual local safety hazard excluded from preemption under the FRSA. See *Beausoleil* v. *National R.R. Passenger Corp.*, 145 F. Supp. 2d at 121. The running of high-speed trains through residential areas and the presence of double tracks with "meets and passes" are general conditions at grade crossings, Statewide in character, that are amenable to uniform, national standards. See *Bowman* v. *Norfolk S. Ry. Co.*, 832 F. Supp. at 1017-1018; *O'Bannon* v. *Union Pac. R.R. Co.*, 960 F. Supp. at 1421.

(i) *Maximum speed.* The Federal Railroad Administration has promulgated regulations under the FRSA establishing the maximum allowable operating speeds for freight and passenger trains for each class of track on which such trains travel. See *CSX Transp., Inc.* v. *Easterwood*, 507 U.S. at 662; 49 C.F.R. § 213.9(a). The *Easterwood* Court noted that the regulations promulgated to enforce the FRSA "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *CSX Transp., Inc.* v. *Easterwood, supra* at 675. Therefore a State law tort claim against a railroad based on excessive speed is preempted by the FRSA if the train was operating within the Federally prescribed speed limits. See, e.g., *CSX Transp., Inc.* v. *Easterwood, supra* at 675-676; *Beausoleil* v. *National R.R. Passenger Corp.*, 145 F. Supp. 2d at 120-121.

The circumstances listed by the plaintiff in attempting to establish that the Pine Street crossing is a local safety hazard are amenable to being addressed within the Federal regulatory scheme and, therefore, do not fall within the savings clause of

the preemption statute. The discussion does not end here, however, because there appears to be a genuine issue of material fact as to the train's speed. More specifically, it is undisputed that the portion of the Old Colony line at issue is the type of track for which the Federal maximum allowable speed for passenger trains is 80 mph, and the plaintiff has presented some evidence that the train was operating at a speed exceeding 80 mph. Thus, to the extent the plaintiff's wrongful death claim is predicated on speed in excess of the Federal limit, it is not preempted, and such evidence may be used to establish wilful, wanton, or reckless conduct, as further discussed, *infra.*

(ii) *Warning devices.* The Highway Safety Act of 1973, § 203, 87 Stat. 283, created the Federal Railway-Highway Crossings Program, 23 U.S.C. § 130 (1994). See *Norfolk S. Ry. Co.* v. *Shanklin,* 529 U.S. 344, 348 (2000). The program makes funds available to States for the "cost of construction of projects for the elimination of hazards of railway-highway crossings." 23 U.S.C. § 130(a) (1994). The Secretary of Transportation, through the Federal Highway Administration, has promulgated several regulations implementing the Crossings Program. For example, adequate warning devices on any project funded by Federal monies are to include "automatic gates with flashing light signals" when the type of track present here exists. 23 C.F.R. § 646.214(b)(3)(i). See *Norfolk S. Ry. Co.* v. *Shanklin,* 529 U.S. at 348-349. Because the requirements are mandatory for all warning devices installed with Federal funds, once such monies are provided, and the warning devices are installed and operated, 23 C.F.R. § 646.214(3) and (4) preempt State law claims based on the adequacy of warning devices. See *CSX Transp., Inc.* v. *Easterwood,* 507 U.S. at 670-671; *Norfolk S. Ry. Co.* v. *Shanklin,* 529 U.S. at 358-359; *O'Bannon* v. *Union Pac. R.R. Co.,* 960 F. Supp. at 1417.

Here, the evidence established that the design and construction of the warning devices at the Pine Street crossing were Federally funded in accordance with 23 C.F.R. § 646.214. The Federal regulations are thus triggered and preempt the plaintiff's common-law claims based on the inadequacy of the warning devices at the Pine Street crossing. Furthermore, as stated,

*supra*, the Pine Street crossing is not a local safety hazard within the meaning of 45 U.S.C. § 20106. Accordingly, the plaintiff may not rely on Amtrak's or the MBTA's failure to install and maintain four-quadrant gates to support his wrongful death claim predicated on wilful, wanton, or reckless conduct under G. L. c. 229, § 2.

b. *Applicability of 23 U.S.C. § 409.* The plaintiff claims that Amtrak and the MBTA's conduct was wilful, wanton, or reckless based on their inaction in the face of knowledge that children and bicyclists were proceeding around lowered crossing gates at several grade crossings along the Old Colony line. To establish this claim, the plaintiff relies upon documents, reports, and testimony derived from the corridor analysis and the video surveillance tapes installed as part of the MBTA's four-quadrant gate demonstration project. The defendants contend such evidence is inadmissible pursuant to 23 U.S.C. § 409 (1994 & Supp. III 1998).

Section 409 of 23 U.S.C. provides that "reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings pursuant to [§§ 130, 144, and 152 of 23 U.S.C.,] or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding . . . in any action for damages arising from any occurrence at a location mentioned or addressed in" such documents.

The congressional intent in enacting § 409 was to encourage candid evaluation and correction of highway and railway safety hazards by shielding the process from the roving eyes of tort litigants. See *Robertson* v. *Union Pac. R.R. Co.*, 954 F.2d 1433, 1435 (8th Cir. 1992); *Harrison* v. *Burlington N. R.R. Co.*, 965 F.2d 155, 160 (7th Cir. 1992). See also *Pierce County* v. *Guillen*, 537 U.S. 129, 145-146 (2003). Section 409 does not require that the sole purpose for the compilation or collection of data be one specified in the statute, i.e., the compilation need not have been specifically funded pursuant to 23 U.S.C. §§ 130, 144, or

152. See *Robertson* v. *Union Pac. R.R. Co.*, 954 F.2d at 1435 n.3; *Lusby* v. *Union Pac. R.R. Co.*, 4 F.3d 639, 641 (8th Cir. 1993). Section 409 "protects not just the information the agency generates, i.e., compiles, for § 152 purposes, but also any information that an agency collects from other sources for § 152 purposes." *Pierce County* v. *Guillen*, 537 U.S. at 145. The statute governs documents authored in the interest of developing safety enhancement projects even if such documents encompass information compiled for proposed or future plans eligible for Federal funds. See *Harrison* v. *Burlington N. R.R. Co.*, 965 F.2d at 159; *Rodenbeck* v. *Norfolk & W. Ry. Co.*, 982 F. Supp. 620, 623-624 (N.D. Ind. 1997).

Here, the summary judgment record reveals that the purpose of the corridor analysis was to evaluate possible safety enhancements, including the use of four-quadrant gates, at the forty-four grade crossings along the Old Colony line. To that end, surveillance cameras were installed to gather information on and evaluate the desirability and feasibility of utilizing four-quadrant gates at the crossings. The corridor analysis and four-quadrant gate project thus involved a highway safety construction improvement project within the meaning of the Federal aid statutes. The fact that the corridor analysis was funded under 49 U.S.C. § 5312(c)(2) (1994), a grant "for projects that will use innovative techniques and methods in managing and providing mass transportation," does not detract from its explicit safety improvement purpose. Because the installation of four-quadrant gates along the Old Colony line would be eligible for Federal funds, the data and reports compiled or collected for the corridor analysis and four-quadrant gate project are covered by § 409 and therefore protected from discovery and admissibility at trial.

The plaintiff also argues that the information is not protected by § 409 because it concerns crossings other than the Pine Street crossing. The surveillance tapes were compiled as part of a comprehensive analysis of whether four-quadrant gates should be installed at all grade crossings along the Old Colony line. The three locations (not the Pine Street crossing) were chosen as representative of the conditions grade crossings on the line generally, including the Pine Street crossing, and thus "ad-

dress" the Pine Street crossing within the meaning of § 409. The plaintiff's claim has no merit.

The motion judge properly held that § 409 protects from discovery and admissibility at trial the various documents and testimony derived from the corridor analysis and the video surveillance tapes.[11]

c. *Sufficiency of admissible evidence.* The sole remaining admissible evidence to support the plaintiff's theory of wilful, wanton, or reckless conduct by the defendants is that Prone failed to sound the train's horn in compliance with regulations, see G. L. c. 160, § 138, and that the speed of the train exceeded the Federal speed limit of 80 mph.[12]

"Wilful conduct has been described as action intended to do harm, while conduct is wanton or reckless when 'in the face of a known or obvious risk [one] intentionally persist[s] in conduct involving a high degree of probability that substantial harm would result to another.' *Desmond* v. *Boston Elev. Ry.,* 319 Mass. 13, 16 (1946), and cases cited. See also *Siver* v. *Atlantic Union College,* 338 Mass. 212, 216 (1958); Restatement (Second) of Torts § 500 comments (a) and (g) (1965)." *Gage* v. *Westfield,* 26 Mass. App. Ct. at 691. See *Sandler* v. *Commonwealth,* 419 Mass. 334, 335-337 (1995). In the case of a railroad accident, excess speed and inadvertence, by themselves, do not constitute recklessness. *Gage* v. *Westfield,* 26 Mass. App. Ct. at 691. This would be so even assuming that a defendant knew that people often crossed the tracks at a particular location.

---

[11]We also find no merit in the plaintiff's claim that the defendants waived the § 409 privilege by producing the corridor analysis report and four-quadrant gate study in discovery. We agree with the motion judge that the common law of privilege waiver, see, e.g., *Matter of the Reorganization of Elec. Mut. Liab. Ins. Co. Ltd. (Bermuda),* 425 Mass. 419, 421-422 (1997), does not apply based on the statutory language of § 409 evincing an intent that its discoverability and admissibility standards supersede common law principles. See generally *Robertson* v. *Union Pac. R.R. Co.,* 954 F.2d at 1435. See also *Walden* v. *Department of Transp.,* 27 P.3d 297, 305 (Alaska 2001).

[12]Although the plaintiff could not recover for negligence under G. L. c. 160, §§ 138 and 232, because Kelly was on the rail tracks in violation of the law, see G. L. c. 160, § 218, the plaintiff presented some evidence that Prone failed to sound the horn in compliance with regulations and this evidence can be used as evidence of wilful, wanton, or reckless conduct for purposes of the wrongful death statute, G. L. c. 229, § 2.

*Ibid.* See *Beausoleil* v. *Massachusetts Bay Transp. Authy.*, 138 F. Supp. 2d at 199-200.

Violation of a statute, rule, or regulation, standing alone, is at best evidence of negligence and does not warrant a finding of wanton or reckless conduct. See *Commonwealth* v. *Welansky*, 316 Mass. 383, 403 (1944); *Commonwealth* v. *Godin*, 374 Mass. 120, 129 (1977), cert. denied, 436 U.S. 917 (1978). See also Restatement (Second) of Torts § 500 comment e (1965).

In *Gage*, we reversed the motion judge's decision to allow summary judgment on the wilful, wanton, or reckless claim because there was "an indication of something more." *Gage* v. *Westfield*, 26 Mass. App. Ct. at 691. Specifically, there was evidence of radio communication between the operators of the two freight trains approaching the accident area from opposite directions. *Ibid.* "If the operator of the westbound train or the dispatcher warned the operator of the eastbound train of the presence of the two youths on the tracks in time to avoid the accident, and the eastbound train's operator did not immediately attempt to stop the train, a jury could find that operator reckless." *Id.* at 691-692. In this case, Prone's excessive speed and failure to sound the train's horn in accordance with the rules do not amount to recklessness, and there is simply no evidence of "something more." Accordingly, the motion judge properly dismissed the plaintiff's wrongful death claim based on wilful, wanton, or reckless conduct.

*Judgment affirmed.*