J. Michael Boyd, administrator,[1] *vs.* National Railroad Passenger Corporation[2] & others.[3]

Suffolk. January 6, 2006. - April 14, 2006.

Present: Marshall, C.J., Greaney, Ireland, Spina, Sosman, & Cordy, JJ.

*Railroad. Practice, Civil,* Summary judgment. *Wilful, Wanton, or Reckless Conduct. Wrongful Death.*

Discussion of the legal principles governing a wrongful death claim brought against a railroad for reckless conduct. [546-548]

In a wrongful death action based on a train accident, the plaintiff presented sufficient evidence to create a triable issue of material fact whether the defendants' conduct in purportedly failing to sound the train's warning whistle in accordance with the mandates of G. L. c. 160, § 138, and in purportedly exceeding the federally prescribed maximum speed limit at the time of the accident constituted reckless conduct. [548-554]

Civil action commenced in the Superior Court Department on September 13, 1999.

The case was heard by *Diane M. Kottmyer, J.,* on a motion for summary judgment, and a motion for reconsideration was also heard by her.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*John B. Flemming (Joseph P. Musacchio* with him) for the plaintiff.

*David T. Mitrou* for the defendants.

Spina, J. On June 24, 1998, Kelly Ann Boyd (Boyd), fifteen years old, was struck and killed by a commuter rail train at the Pine Street grade crossing in Abington. Her father, J. Michael Boyd (plaintiff), filed a wrongful death action against the National Railroad Passenger Corporation (Amtrak), the Massachusetts Bay Transportation Authority (MBTA), and Richard

---

[1] Of the estate of Kelly Ann Boyd.

[2] Doing business as and also known as Amtrak.

[3] Massachusetts Bay Transportation Authority and Richard Prone.

Prone, the engineer who had been operating the train at the time of the accident. The plaintiff's complaint asserted claims predicated on (1) negligence against Amtrak, the MBTA, and Prone; (2) statutory violations for failure to give adequate warnings against Amtrak and the MBTA; and (3) gross negligence and wilful, wanton, or reckless conduct against Amtrak and the MBTA. A judge in the Superior Court allowed the motion for summary judgment filed by Amtrak, the MBTA, and Prone, and the plaintiff's complaint was dismissed.

The Appeals Court affirmed the judgment, concluding, inter alia, that the plaintiff's wrongful death claims alleging wilful, wanton, or reckless conduct by Amtrak and the MBTA (together, the defendants) had been properly dismissed because (1) local speed limit and safety gate requirements were preempted by the Federal Railroad Safety Act (FRSA), 49 U.S.C. §§ 20101 et seq. (2000), and related regulations promulgated by the Federal Railroad Administration (FRA); (2) documents, reports, and testimony related to the defendants' purported knowledge that children were circumventing safety gates at grade crossings were excluded from discovery or admission in evidence, pursuant to 23 U.S.C. § 409 (2000), where such information had been obtained from train corridor analyses and video surveillance tapes[4]; and (3) the remaining admissible evidence produced by the plaintiff, relating to Prone's alleged excessive speed beyond federally prescribed limits and Prone's failure to sound the train's whistle[5] in compliance with G. L. c. 160, § 138,[6] was insufficient to support the plaintiff's claims that the

[4]Pursuant to 23 U.S.C. § 409 (2000), "reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to [23 U.S.C. §§ 130, 144, and 152,] or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted in evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data."

[5]The parties refer to the terms "whistle" and "horn" interchangeably. For purposes of this opinion, there is no meaningful distinction between the terms.

[6]General Laws c. 160, § 138, states: "Every railroad corporation shall

defendants had engaged in wilful, wanton, or reckless conduct.[7] See *Boyd* v. *National R.R. Passenger Corp.*, 62 Mass. App. Ct. 783, 791-798 (2005). We granted the plaintiff's application for further appellate review, limited specifically to the issue of reckless conduct. As to that issue, the judgment of the Superior Court dismissing the plaintiff's complaint is reversed.[8]

A comprehensive factual and procedural history of this case is set forth in the Appeals Court's opinion. We describe only those facts relevant to this limited appeal and reserve for later discussion the details relevant to the defendants' alleged reckless conduct.

In September, 1997, the MBTA completed the rebuilding of the Old Colony railroad line, which restored rail service to numerous South Shore communities after thirty-eight years of nonuse. As part of this project, the MBTA contracted with Amtrak to be the commuter railroad operator. The town of Abington is located on the Kingston-Plymouth branch of the Old Colony line and has five public grade crossings, including one at Pine Street, where the accident at issue occurred. Double railroad tracks run through this crossing, enabling high-speed trains to meet and pass in opposite directions several times each

cause a bell of at least thirty-five pounds in weight, and a whistle, to be placed on each locomotive engine passing upon its railroad; and such bell shall be rung or at least three separate and distinct blasts of such whistle sounded at the distance of at least eighty rods from the place where the railroad crosses upon the same level any public way or traveled place over which a signboard is required to be maintained as provided in [§§ 140 and 141]; and such bell shall be rung or such whistle sounded continuously or alternately until the engine has crossed such way or traveled place." Eighty rods is the equivalent of 1,320 feet, or of one-quarter mile.

[7] In its opinion, the Appeals Court also concluded that (1) the plaintiff's wrongful death claims predicated on negligence were properly dismissed where Boyd's presence on the railroad tracks at the time of the accident was "contrary to law," in that it was a violation of G. L. c. 160, § 218, which prohibits all manner of trespass on railroad property, including the circumvention of safety gates lowered to signal the approach of a train; and (2) the plaintiff's wrongful death claims predicated on statutory violations were properly dismissed where failure to provide statutory signals did not create liability for the defendants, irrespective of negligence, when the defendants demonstrated that Boyd was on the tracks in violation of the law. See *Boyd* v. *National R.R. Passenger Corp.*, 62 Mass. App. Ct. 783, 788-791 (2005).

[8] As to those other issues raised by the parties before the Appeals Court, the well-reasoned decision of the Appeals Court is final and binding.

day. The Pine Street grade crossing is equipped with automatic safety gates, bells, and warning lights.

During the early afternoon of June 24, 1998, Boyd rode her bicycle up Pine Street toward the railroad tracks, where she was observed by John Silva, a motorist who had been traveling in the same direction as Boyd until he stopped at the Pine Street grade crossing. The automatic safety gates had been lowered, the bells were ringing, and the warning lights were flashing. A southbound train went through the crossing on the east side of the track at a "pretty slow" or "normal" rate of speed. After that train passed, Boyd rode her bicycle around Silva's car, looked to the right and the left down the tracks, proceeded around the lowered safety gate, and began to cross the northbound track. According to Silva, it was difficult to see down the tracks because a signal bungalow obstructed the view, but he plainly could hear train whistles blowing. A fast-moving northbound train struck Boyd as she reached the middle of the first track, killing her.

According to an incident report filed by Abington police Officer Robert O'Keefe, the train's lights, horn, and bell were all in working order. The statements that Prone gave to Abington, MBTA, and State police officers, as well as to Amtrak investigators, as to exactly how the accident occurred were somewhat inconsistent. The substance of Prone's statements was that he had been operating the train in a northbound direction and had just passed the southbound train when he noticed Boyd starting to cross the tracks. The safety gates were down at the grade crossing, his headlights were flashing, and he was sounding his horn. Prone claimed that he blew the horn for ten to fifteen seconds before impact, and that he had been sounding it almost continuously through all of North Abington. When he realized that Boyd was not stopping at the safety gates, Prone applied the emergency brakes, but it was too late, and he struck her. In his statements to Amtrak investigators, Prone claimed that he applied the emergency brakes about 300 feet before the point of impact, but in his statement to the State police, the distance was "approximately 200 feet."

Pursuant to 49 C.F.R. § 213.9(a) (1997), the maximum allowable speed for a passenger train on a Class 4 track, the type

involved here, was eighty miles per hour, although the defendants had set a more stringent maximum allowable speed of seventy miles per hour along the Old Colony line. Prone told MBTA and State police officers that he had been operating the train at approximately seventy miles per hour when he approached the Pine Street grade crossing. However, data from the train's event recorder indicated that the train had been operating at a speed of seventy-eight miles per hour approximately twelve to fourteen seconds before the collision occurred, and that the train was traveling at approximately seventy-five miles per hour when it hit Boyd. Data from the event recorder also showed that as the train approached the Pine Street crossing, Prone had "feathered" the horn, which meant that the horn was not sounded very much. The data indicated that the horn was blown continuously for five to six seconds immediately before the collision, suggesting the moments when Prone observed Boyd on the tracks. Amtrak's incident report concluded that Prone had been exceeding the maximum authorized speed limit while operating the train, and that at three grade crossings earlier in his run, Prone had not sounded his engine whistle in proper compliance with rules promulgated by the Northeast Operating Rules Advisory Committee (NORAC).[9] Prone was suspended for thirty days for these violations in accordance with his union contract.

We begin with the familiar principle that "[t]he standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). See Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). Here, all evidentiary inferences must be resolved in favor of the plaintiff. See *Simplex Techs.,*

---

[9]Prone had received a grade of 100% on the 1997 Northeast Operating Rules Advisory Committee (NORAC) operating rules examination for train and engine service employees. NORAC rule 19 states that an engine whistle or horn signal must be given in a pattern of two long whistles, followed by a short whistle, and then one long whistle when approaching a public grade crossing. Prone testified in his deposition that he was never told that there was a separate State law governing the distance from a grade crossing at which an engineer was required to sound a warning horn and that he had only been instructed on NORAC rules.

*Inc.* v. *Liberty Mut. Ins. Co.*, 429 Mass. 196, 197 (1999). Summary judgment is seldom granted in a cause of action alleging reckless conduct. See *Manning* v. *Nobile*, 411 Mass. 382, 388 (1991). However, this is not an absolute rule. See *id.* See also *Hawco* v. *Massachusetts Bay Transp. Auth.*, 398 Mass. 1006, 1007 (1986) (no error in directing verdict for defendant MBTA on count of complaint alleging wilful, wanton, or reckless conduct).

The plaintiff contends that, when viewing the totality of the circumstances surrounding Boyd's death, he presented sufficient evidence to show that the defendants' conduct in the face of exceedingly dangerous conditions created a high degree of risk that death or serious physical harm would result. The plaintiff focuses on evidence that Prone was operating the train at an excessive rate of speed and that he failed to sound the train's horn at least 1,320 feet from the Pine Street grade crossing, in violation of G. L. c. 160, § 38. Such evidence, the plaintiff argues, created a triable issue of material fact whether the defendants' conduct constituted reckless disregard for the safety of another such that the defendants should be held liable for damages.[10] We agree.

---

[10]After the defendants' motion for summary judgment was allowed, the plaintiff filed a motion for reconsideration on the ground that the issue whether Prone's failure to sound the horn in accordance with G. L. c. 160, § 138, and applicable NORAC rules was a proximate cause of the accident was not raised by the defendants in their summary judgment motion and, as such, the plaintiff had not submitted any evidence on the matter. Alternatively, the plaintiff requested leave to supplement the summary judgment record to include an affidavit from John Silva, the witness to the accident, and additional deposition testimony from Patrick Robinson, a technical supervisor for Amtrak, pertaining to horn analysis. The defendants opposed the plaintiff's motion on the grounds that it was untimely and did not raise any issues that the plaintiff had not already had the opportunity to address. Nonetheless, the judge allowed, in part, the plaintiff's motion. While not permitting any additions to the summary judgment record, the judge agreed with the plaintiff that the issue of the sufficiency of the evidence as to the causal connection between Prone's failure to sound the horn and Boyd's death had not been not squarely presented, and the judge struck, as dicta, language from her memorandum of decision relating to that issue. For our purposes here, we have not considered either the affidavit of Silva, relying instead on the statements he made to investigators, or the additional deposition testimony of Robinson, relying instead on only those portions of his deposition that were included in the summary judgment record.

The Massachusetts wrongful death statute, G. L. c. 229, § 2, provides that a wrongful death claim may be brought against someone who, by wilful, wanton, or reckless act, causes the death of another person. The statute includes a specific exemption to liability for railroads that states that "a person operating a railroad shall not be liable for *negligence* in causing the death of a person while walking or being upon such railroad contrary to law or to the reasonable rules and regulations of the carrier" (emphasis added). G. L. c. 229, § 2. See *Gage* v. *Westfield*, 26 Mass. App. Ct. 681, 691 (1988). However, even where a decedent is a trespasser, a railroad can be held liable for damages if the conduct of its agents that caused such death was wilful, wanton, or reckless. See G. L. c. 229, § 2. See also *Sawler* v. *Boston & Albany R.R.*, 339 Mass. 34, 36 (1959); *Corrado* v. *New York, N.H. & H.R.R.*, 333 Mass. 417, 418-419 (1956); *Beausoleil* v. *Massachusetts Bay Transp. Auth.*, 138 F. Supp. 2d 189, 199, *S.C.*, 145 F. Supp. 2d 119 (D. Mass. 2001).

In the civil context, this court has adopted the definition of "reckless disregard of safety" set forth in Restatement (Second) of Torts § 500 (1965):

> "The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."

See *Sandler* v. *Commonwealth*, 419 Mass. 334, 336 n.2 (1995). See also *Montes* v. *Massachusetts Bay Transp. Auth.*, ante 181, 185 (2006); *Inferrera* v. *Sudbury*, 31 Mass. App. Ct. 96, 101 (1991). The imposition of tort liability for reckless disregard of safety can be based on either a subjective or an objective standard for evaluating knowledge of the risk of harm. See *Sandler* v. *Commonwealth*, *supra*; *Commonwealth* v. *Welansky*, 316 Mass. 383, 398 (1944). Under the subjective standard, "the actor knows, or has reason to know . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or

indifference to, that risk." Restatement (Second) of Torts, *supra* at § 500 comment a, at 588. See *Sandler* v. *Commonwealth*, *supra* at 337-338 (Commonwealth through Metropolitan District Commission knew of danger posed by missing drain cover along bike path and failed to respond reasonably); *Gage* v. *Westfield*, *supra* at 691-692 (evidence that train operator may have been warned about people on tracks in time to avoid collision, but failed to stop train immediately, created triable issue of fact as to recklessness). Under the objective standard, "the actor knows, or has reason to know . . . of facts which create a high degree of risk of physical harm to another," but the actor "does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so." Restatement (Second) of Torts, *supra* at § 500 comment a. The actor "is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it." *Id.* With respect to both the subjective and objective standards for evaluating whether conduct is reckless, "the actor must know, or have reason to know, the facts which create the risk . . . the risk must itself be an unreasonable one under the circumstances," and the conduct "must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent." *Id.*

More specifically, the conduct at issue "must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence." *Id.* See *Montes* v. *Massachusetts Bay Transp. Auth.*, *supra* at 185-186, and cases cited (excessive speed and inattention by train operator, without more, do not constitute recklessness, but may constitute negligence or gross negligence). While negligence may result from "inadvertence, incompetence, unskillfulness, or a failure to take [adequate] precautions," recklessness "requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." Restatement (Second) of Torts, *supra* at § 500 comment g, at 590. See *Inferrera* v. *Sudbury*, *supra* at 101-102. "[R]eckless conduct involves a degree of risk and a voluntary taking of that risk so marked that, compared to negligence, there is not

just a difference in degree but also a difference in kind."[11] *Sandler* v. *Commonwealth, supra* at 337, and cases cited (persistent failure of governmental unit to remedy defects in tunnel on traveled bikeway, a known danger, deemed insufficient to constitute reckless conduct). See *Manning* v. *Nobile*, 411 Mass. 382, 388-389 (1991) (hotel's failure to follow its policy of requiring presence of hotel bartenders at large parties not reckless conduct where no evidence of high degree of probability that guest would be injured); *Desmond* v. *Boston Elev. Ry.*, 319 Mass. 13, 14 (1946). Over the years, "this court has been careful to preserve the distinction between negligence and gross negligence, on the one hand, and wanton or reckless conduct on the other." *Commonwealth* v. *Welansky, supra* at 400. We add that while purportedly reckless conduct must be intended by the actor, the actor need not intend to cause the grave harm that results therefrom. See *id.* at 398 ("What must be intended is the conduct, not the resulting harm"). See also *Sandler* v. *Commonwealth, supra* at 335; *Andover Newton Theological Sch., Inc.* v. *Continental Cas. Co.*, 409 Mass. 350, 352 (1991); Restatement (Second) of Torts, *supra* at § 500 comment f, at 590.

Here, the reckless conduct alleged by the plaintiff arises primarily from the defendants' purported violation of two statutes governing safe operation of a train. As enunciated in Restatement (Second) of Torts, *supra* at § 500 comment e, at 589, "[t]he mere fact that certain precautions are required by a statute rather than the common law does not of itself make the intentional omission of the statutory precaution reckless indifference to the safety of others. In order that the breach of the statute constitute reckless disregard for the safety of those for whose protection it is enacted, the statute must not only be intentionally violated, but the precautions required must be such that their omission will be recognized as involving a high degree of probability that serious harm will result." See *Isaacson* v. *Boston, Worcester & N.Y. St. Ry.*, 278 Mass. 378, 388-390

---

[11]The comparative negligence statute is not applicable to intentional or wilful, wanton, or reckless conduct. See *Flood* v. *Southland Corp.*, 416 Mass. 62, 65 (1993); *Zeroulias* v. *Hamilton Am. Legion Assocs.*, 46 Mass. App. Ct. 912, 914 (1999).

(1932) (evidence of recklessness found in simultaneous viola-
tions of three statutes pertaining to operation of motor vehicles
on highway). In other words, the intentional failure to comply
with statutory precautions, by itself, does not rise to the level of
reckless conduct. See *Commonwealth* v. *Godin*, 374 Mass. 120,
129 (1977), cert. denied, 436 U.S. 917 (1978); *Commonwealth*
v. *Welansky*, *supra* at 403. Cf. *Montes* v. *Massachusetts Bay
Transp. Auth.*, *supra* at 186. Such conduct, if proved, will typi-
cally constitute negligence or gross negligence. See *id.* at 187.
However, the intentional failure to comply with statutory precau-
tions, coupled with a clear subjective or objective recognition
that the omission of the required precautions creates a high
degree of risk that death or grave physical harm will result to
those very persons for whom the safety precautions were
enacted, may constitute recklessness. See *Isaacson* v. *Boston,
Worcester & N.Y. St. Ry.*, *supra*; *Gage* v. *Westfield*, 26 Mass.
App. Ct. 681, 691-692 (1988). See also *Callison* v. *Charleston
& W.C. Ry.*, 106 S.C. 123, 129 (1916) (failure of railroad to
give statutorily required signals at public crossing is sufficient
to warrant reasonable inference of recklessness). We therefore
consider whether, on this record, the plaintiff has presented suf-
ficient evidence to raise a triable issue of fact whether the
defendants' conduct was reckless. See *Inferrera* v. *Sudbury*, 31
Mass. App. Ct. 96, 102-103 (1991).

"It is well settled that a railroad in the operation of its trains
has exclusive use of a grade crossing while they are passing
over it; . . . if the statutory signals are given and a traveller
disregards the warning and without sufficient reason insists
upon crossing, [she] does so at [her] own risk." *Dole* v. *Boston
& Me. R.R.*, 308 Mass. 46, 50 (1941), quoting *Gannett* v. *Boston
& Me. R.R.*, 238 Mass. 125, 131 (1921). See *Granger* v. *Boston
& Albany R.R.*, 146 Mass. 276, 280 (1888). However, that
traveler is in a far different position if the statutory signals are
not given as required. The importance of such signals cannot be
overemphasized. When the FRA updated and enhanced its track
safety standards in 1998 to address changes in the railroad
operating environment, it recognized that "[t]he physical proper-
ties of a moving train virtually always prevent it from stopping
in time to avoid hitting an object on the tracks regardless of the

speed at which the train is traveling." 63 Fed. Reg. 33,992, 33,999 (1998). The almost certain outcome of being struck by a high-speed train is either death or grave physical injury. In his deposition, John Powers, deputy director of design and construction for the MBTA, acknowledged that grade crossings, in particular, are very dangerous places, and that safety protections for travelers are warning devices such as gates, bells, and the locomotive's whistle. Similarly, John Ray, MBTA deputy director of railroad operations, opined that public grade crossings are the most dangerous locations on a rail line. Further, he stated that the MBTA was aware, separate and apart from any surveillance evidence, that, from time to time, pedestrians and bicyclists went around lowered safety gates at grade crossings.[12]

Pursuant to G. L. c. 160, § 138, the engineer of a train must start sounding its whistle at least 1,320 feet before a public grade crossing and must continue sounding it until the engine has traversed such crossing.[13] See note 6, supra. Further, in accordance with NORAC rule 19, the engine whistle or horn signal must be sounded in a specified pattern as the train approaches the grade crossing or a so-called "whistle post." See note 9, supra. The FRA has set the minimum train whistle volume at ninety-six decibels, see 49 C.F.R. § 229.129 (2005), so that it can be heard by a motorist who may be more than 1,300 feet away from a train. State law, FRA regulations, and NORAC rules are all evidence of the fact that the sounding of a train's whistle on approach to a public grade crossing is a vital and indispensable warning of potential impending danger. It is the person at the grade crossing who has the last best chance of

[12]John Ray's deposition indicates that he was basing this statement on his general knowledge and experience as deputy director of railroad operations for the MBTA, rather than on knowledge specifically obtained from video surveillance cameras that had been installed at various grade crossings as part of the MBTA's four-quadrant gate demonstration project and that are protected from discovery and admissibility at trial under 23 U.S.C. § 409 (2000). See Boyd v. National R.R. Passenger Corp., 62 Mass. App. Ct. 783, 795-797 (2005).

[13]The use of an engine-mounted horn is required by G. L. c. 160, § 138, except where the sounding of whistles is regulated or forbidden by written order of the Department of Telecommunications and Energy in accordance with G. L. c. 160, § 139. The parties have not claimed that such an order was in effect here.

preventing an accident, one that undoubtedly will have catastrophic results.

Patrick Robinson, a technical supervisor for Amtrak, was assigned the task of analyzing and testing the data from the event recorder in the locomotive. In his deposition testimony, Robinson opined, and the data reflected, that Prone had sounded the horn continuously for five to six seconds immediately before the train collided with Boyd at the Pine Street grade crossing. If, as Prone claimed, he had been operating the train at seventy miles per hour, sounding the horn six seconds from the grade crossing would have been a distance of only 616.2 feet,[14] not 1,320 feet as required by G. L. c. 160, § 138. Alternatively, if Prone had been operating the train at eighty miles per hour, the maximum allowable speed for a passenger train on a Class 4 track, sounding the horn six seconds from the grade crossing would have been a distance of only 704.4 feet,[15] still not statutorily compliant. In his deposition, Prone testified that, in his opinion, 500 to 700 feet before the Pine Street grade crossing was a reasonable distance to begin sounding the horn and that this was what he had done.

Based on the data from the event recorder, Robinson was able to determine the time when the actual collision occurred within a window of two seconds. At a speed of seventy miles per hour, it would take 12.85 seconds to go a distance of 1,320 feet. At a speed of eighty miles per hour, it would take 11.24 seconds to travel that same distance. However, the data from the event recorder did not indicate that the horn was, in fact, sounded between eleven and thirteen seconds before the Pine Street grade crossing. Rather, the horn had been "feathered" earlier than that time frame and, then, had been sounded five to six seconds before the collision. By sounding the horn only 600 to 700 feet from the grade crossing, Prone effectively halved the amount of time that Boyd could escape an accident once she started across the tracks and realized that a train was bearing down on her.

Along a similar vein, the FRA has promulgated regulations under the FRSA that set forth the maximum allowable operating

[14] Seventy miles per hour is the equivalent of 102.7 feet per second.
[15] Eighty miles per hour is the equivalent of 117.4 feet per second.

speeds for passenger trains along the various classes of railroad tracks. See 49 C.F.R. § 213.9(a). See also *CSX Transp., Inc.* v. *Easterwood,* 507 U.S. 658, 662 (1993). As we have stated, the maximum allowable speed for a passenger train on a Class 4 track, the type involved in this case, was eighty miles per hour. See 49 C.F.R. § 213.9(a). A cause of action under State law that is based on excessive speed is preempted by the FRSA in the absence of evidence that the train was operating outside the federally prescribed speed limit. See *CSX Transp., Inc.* v. *Easterwood, supra* at 675-676. Here, the plaintiff presented such evidence which, if believed, would suggest that Prone had been exceeding the federally prescribed speed limit at the time the train hit Boyd. James Loumiet, a specialist in train accident reconstruction, analyzed the data on the locomotive's event recorder and concluded, based on an analysis of emergency braking distances, that the train operated by Prone had actually been traveling faster than the speed shown on the data printout. He stated in his affidavit that where the event recorder showed a top traveling speed of seventy-eight miles per hour, the train's actual speed would have been ninety-two miles per hour, and that where the event recorder showed a speed of seventy-five miles per hour (when the emergency brakes were applied), the train's actual speed would have been eighty-eight miles per hour. Loumiet stated that the methodology he used in his preliminary speed analysis was a recognized method of train speed reconstruction. On this evidence, the plaintiff's claim for recklessness would not be preempted by Federal law.

Based on our review of the record, we conclude that the plaintiff has presented sufficient evidence to create a triable issue of material fact whether the defendants' conduct in purportedly failing to sound the train's warning whistle in accordance with the mandates of G. L. c. 160, § 138, and in purportedly exceeding the federally prescribed maximum speed limit at the time of the accident constituted reckless conduct. The evidence does not suggest merely the intentional omission of statutorily required safety precautions. Rather, it arguably suggests the intentional omission of such precautions, coupled with recogni-

tion that such omission involves a high risk that death or grave bodily harm will result. Even if Prone, himself, did not realize that his conduct created a high degree of risk to pedestrians and bicyclists like Boyd, the evidence raises a jury question whether a reasonable train engineer in his position would have appreciated the extreme danger associated with the failure strictly to adhere to statutorily mandated safety precautions.

We reiterate that, for a plaintiff to be successful on a claim alleging recklessness, the risk created by a defendant's conduct must be *substantially* greater than that which would constitute negligence, and the risk must be one involving an easily perceptible danger of death or grave physical harm. See Restatement (Second) of Torts, *supra* at § 500 & comment g. This is a significant distinction, and our decision should not be interpreted as diminishing in any way the high evidentiary standard that must be satisfied in order to establish reckless conduct, rather than negligence. See *Sandler* v. *Commonwealth*, 419 Mass. 334, 337 (1995). Here, it is the intersection of multiple factors — the alleged violations of two statutes designed to protect the public from harm (which required the taking of simple precautions to reduce an enormous risk), the extreme danger posed by public grade crossings, the residential character of the neighborhood around the Pine Street crossing, the MBTA's awareness that pedestrians and bicyclists sometimes went around lowered safety gates, and the high risk of death resulting from an accident — that creates a triable issue of material fact whether the defendants' conduct was, in fact, reckless. See *Isaacson* v. *Boston, Worcester & N.Y. St. Ry.*, 278 Mass. 378, 389-390 (1932) (jury could have found that statutory violations, coupled with complete indifference to, or reckless disregard of, legal obligation to safety of others constituted reckless misconduct).

Accordingly, as to those two counts of the plaintiff's complaint asserting claims predicated on reckless conduct against the defendants, we conclude that the plaintiff has presented sufficient evidence to warrant denial of the defendants' motion for summary judgment on those claims. The judgment of dismissal on the plaintiff's claims for recklessness is reversed,

and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*