ABRAHAM H. GRANGER, administrator, *vs.* BOSTON AND ALBANY RAILROAD COMPANY.

GEORGE W. CHIPMAN, administrator, *vs.* SAME.

Suffolk. January 18, 19, 1888. — March 2, 1888.

Present: MORTON, C. J., DEVENS, HOLMES, & KNOWLTON, JJ.

*Railroad — Loss of Life — Contributory Negligence.*

A person who enters upon a railroad at a grade crossing when gates with signal lanterns thereon are down, passes in front of an approaching freight train already upon the crossing, and is killed by an express train running on another track at its usual speed and on time, is guilty of contributory negligence, and recovery cannot be had for his death.

TWO ACTIONS OF TORT, by the administrators of the estates of Frederick W. Granger and of Frederick Murray, for causing their death. The second count of the declaration in each case, which alone need be stated, alleged that the intestates, while in the exercise of due care and not passengers or in the defendant's

employment, were killed at a crossing of the defendant's railroad through the negligence of the defendant.    Answer in each case, a general denial.

The cases were tried together in the Superior Court, before *Thompson*, J., who allowed a bill of exceptions, which, so far as material, was as follows:

The intestates were killed at the Cambridge Street crossing, near the Allston station in Brighton, on November 10, 1884, at about ten minutes past five o'clock in the afternoon.    At that crossing, Cambridge Street is crossed obliquely at grade by the defendant's railroad, which there consists of four tracks, the first track on the easterly side being used as a freight track, the second for both freight and passenger service, and the third and fourth for passenger service exclusively.    On the northerly side of Cambridge Street, and on the easterly side of the railroad, near the first track, there was a gateman's house.    The crossing was protected by gates, which swung up and down, and when down closed the whole of the highway on each side of the railroad, and shut in the sidewalks, except between the gateman's house and the gate on that side.    At this place the sidewalk was left open when the gates were closed, and the gateman who raised and lowered the gates usually stood upon the sidewalk when his gates were down.    On the afternoon of the accident, the plaintiffs' intestates, who were painters, together with Edward S. Cummings, left their work at a place on the easterly side of the railroad, at about five o'clock P. M., it being then about dark, taking with them some unpainted blinds, to go to their homes on the westerly side of the railroad.    They reached the railroad crossing at about ten minutes past five o'clock.    A freight train from Boston, running on the first track, which was due at the crossing at five o'clock, had entered upon the crossing before their arrival there, and a regular passenger train, which ran express from Boston to Newtonville, was approaching the crossing at the same time, at regular speed and on time, on the third track, the distance between the first and third tracks being about seventeen feet.

Stephen Osgood testified, in substance, that he was a police officer, stationed near the Allston station; that, at the time of the accident, he was standing on the sidewalk, within ten or

twelve feet of the gate, on the westerly side of the railroad; that, at about ten minutes before five o'clock in the afternoon, the freight train was creeping up pretty slow, — two or three miles an hour; that he saw three men trying to pass the freight train, who had some window blinds under their arms; that he "hollered" at them, and shook his club for them to keep back; that the express train was on the third track, coming from Boston, at from thirty to forty miles an hour; that the freight train was over half-way across the crossing; that the gates were down across the street; that the three men were strung along, one after the other; that Cummings, the one that was saved, was in front; that when he shook his club Cummings jumped, and the other two got caught by the engine of the express train, and were instantly killed; that it was quite dark and a little misty, and the lights were on the gates; that the freight train, if it got half-way across, would hide the express train coming out; that there was nothing to prevent the men from hearing the express train; that the freight train made a good deal of noise; that they took their chances; and that there was time to get by the freight train.

On cross-examination, he testified that he first saw the men when they started to pass the freight train; that the engine on the freight train was about fifteen feet from these men when they started to go across; that he noticed that they were going pretty quick, and pretty close to it; that the first thing he noticed of them they were hurrying to get by the freight train; that the gates were down on both sides, and that the lanterns were hung on the gates in their proper places; that the men might have been three or four feet apart; that there was nothing between Cummings and the train to prevent his seeing the approaching express train; that if he had looked down the track he would have seen it; that there was nothing to prevent a man, who was coming up in the direction these men were coming, from seeing that the gates were down at the crossing; that they could not help seeing that the gates were down, and the lights were hung up; that he had seen Murray going over that crossing before that time; that he had to go across four times a day to and from his work; that this was about the regular time that he came back from his work, at that time of year; that the

express train was a regular passenger train, which crossed that crossing at that time every night, and that it was on its time. On re-examination, he testified that it was as dark as it generally is about November 10; that the men could see the lights on the gate, if they looked, and it was evident they could see the freight train.

Edward S. Cummings testified that he was a painter, and worked with the two men who were killed; that they quit work at five o'clock P. M., and got up to the crossing about ten minutes past five; that it was dark enough for lights; that when they got to the crossing he was ahead; that when he got to the crossing he saw the freight train moving along slowly; that he noticed the gates were down across the street; that nobody warned him of the coming of the express train; that he did not know it was coming; that Osgood, the police officer, first attracted his attention to any danger; and that, seeing him motion, he sprang forward. On cross-examination, he testified that he had two blinds under his arm, each about thirty inches long, and the others had three apiece; that he could not say how the others carried their blinds when they crossed the track; that there was nothing in the position of the blinds he carried that would prevent him from seeing the train as it came up the track; that the freight train, when he started to go across the track, was a little more than fifteen feet away; that he thought he had time to get by it; that he hurried, because the train was approaching; that he did not know whether the others hurried or not; that he knew that frequently trains were coming in either direction on the four tracks; that he had passed there at about this same time other nights, and his companions had; that he could not say that he looked up or down the track up to the time that he saw the police officer motion, and that he could not say that either of his companions had; that he had not seen anything of the express train, and had not looked to see; that when he started to go across he saw nothing but the freight train; that when he cleared the freight train he did not look down the track at all, and did not look either way; and that he was heading right across to the other sidewalk.

The locomotive engineer on the freight train testified that he remembered going across the crossing at Allston, and saw three

men hurry across in front of the engine; that they all hurried across; that the last two were on the run; and that they carried some light woodwork on their shoulders. The fireman on the freight train testified that he saw the men hurry to cross in front of his train.

Patrick Ryan testified that he was the gateman at the crossing; that he shut down his gates on the night of the accident for the freight train to come along; and that the lanterns were lighted upon them. On cross-examination, he testified that his lanterns were hung out on the gates before he put them down; that they were hung on hooks, nearer the end than the middle of the gates; that the lanterns were put on before dark; and that he had a flag in the flag-house, but never used it unless the gates were broken or out of order.

The defendant asked the judge to rule and instruct the jury, among other things, that there was no evidence that the plaintiffs' intestates were in the use of due care, or that the defendant was guilty of negligence. The judge refused so to rule, and instructed the jury that these questions were for them, on all the evidence. The jury returned a verdict for the plaintiff in each case on the second count; and the defendant alleged exceptions.

*Samuel Hoar*, for the defendant.

*A. H. Briggs*, for the plaintiffs.

MORTON, C. J. In each of these cases the undisputed evidence shows that the plaintiff's intestate was guilty of negligence which contributed to his injury. The accident happened at a grade crossing, each plaintiff's intestate being struck by a passenger express train running on its usual time. It appeared that before they had reached the track the defendant's gateman had lowered the gates, with signal lanterns attached, across the travelled part of the highway, and the only conclusion which can be reached from the evidence is that the parties injured saw that they were lowered.

Railroads, from the necessity of the case, have the right to the exclusive use of grade crossings when their trains are passing, and it is their duty to give suitable warning of such passing trains to travellers upon the highway. If they do this, and the traveller disregards the warning, and without sufficient excuse insists upon crossing, he does so at his own risk.

In these cases each plaintiff's intestate was warned by the lowered gates that it was unsafe for him to cross the track. It was his duty to wait till the gates were raised; he voluntarily entered upon the track, notwithstanding the warning and without any excuse. This was negligence on his part which caused the accident, and the consequences of his rashness cannot be cast upon the defendant. It is not an answer to say that he may have supposed that the gates were down because the freight train was passing, and he was willing to take the risk of getting safely by that. He had no right so to suppose. It was negligence for him to enter upon the track when he was warned that the railroad required the exclusive use of the crossing for its proper business.

As this is decisive of the cases, it is not necessary to discuss the question whether the evidence shows any negligence on the part of the defendant. *Exceptions sustained.*