Kaplan, Mitchell H., J.
The plaintiff, P. Gioioso & Sons, Inc. (Gioioso) is a construction company based in the Hyde Park section of Boston that provides excavation and other services related to underground water lines and sewers. Between 2001 and 2010, Gioioso purchased general liability, workers’ compensation and automobile insurance policies from the defendant, Liberty Mutual Insurance Company (Liberty). For policies years ending in 2005 through 2010, Gioioso elected to purchase so-called high deductible policies, in which it was responsible to pay the first $300,000 of each covered loss and Liberty provided coverage for all losses in excess of that amount. Under the terms of the policies, Liberty initially paid all covered claims and then sought payment from Gioioso for losses within the deductible amount. As a condition to issuing these policies, Liberty required Gioioso to enter into an Agreement for Guarantee of Financial Obligations (Security Agreement) and provide a letter of credit securing payment for the self-insured losses and premiums anticipated to be due Liberty under this insurance program. In this action, Gioioso asserts that after it stopped purchasing insurance from Liberty, Liberty set the amount of the letter of credit required by the Security Agreement at an unreasonably high amount and this financial obligation caused Gioioso to lose business and suffer economic loss. Gioioso pleads its complaint in four counts: Count I—Breach of Contract; Count II—Breach of the Covenant of Good Faith and Fair Dealing; Count III—Breach of Fiduciary Duty; and Count IV—Violation of G.L.c. 93A, §11.[1]
Liberty has asserted a counterclaim against Gioioso. Count I of the counterclaim is for breach of contract. Here, Liberty asserts that it paid a judgment as a result of a claim covered by the policy it issued Gioioso for the policy year ending in 2005. That was a retrospectively rated policy, and, under the terms of that policy, as a result of payment of the judgment, Gioioso owes Liberty $112,997, which it has refused to pay. In Count II, Liberty asserts that, under the terms of the 2009 Security Agreement, it is due its attorneys fees incurred in defending this action and prosecuting the counterclaim.
For the reasons that follow, Liberty’s motion for summary judgment is ALLOWED as it relates to the complaint, and ALLOWED, in part, and DENIED, in part, as it relates to its counterclaim.
FURTHER BACKGROUND FACTS Facts Relating to High Deductible Policies
In recent years, Gioioso’s gross revenues have been in the range of $35 million to $63 million. At all times relevant to this action, Gioioso was assisted in purchasing its insurance program by an insurance broker, Kevin Racine, a Senior Vice President of USI New England, a Goldman Sachs portfolio company. In 2005, Gioioso opted to switch from retrospectively rated policies to the high deductible policies described above. These policies covered losses arising from incidents that occurred during the policy period regardless of when a claim was asserted, i.e., they were “occurrence” policies, as opposed to “claims made” policies.
As a condition to purchasing this type of policy, each year Liberty required Gioioso to enter into a new Security Agreement, or amend an existing one. The last such Security Agreement was executed in 2009 in connection with the insurance pokey providing coverage for the policy year ending October 30, 2010.
The Security Agreement secured all of Gioioso’s payment obligations “in connection with any and all *513 insurance policies issued to [it].” (The Obligations.) The amount of the required security was specifically “subject to upward or downward adjustment in amount by [Liberty] at least annually to reflect then-current estimated loss reimbursement Obligations.” Security for payment of these Obligations, both existing Obligations and those arising thereafter, was to be by means of “a clean, irrevocable letter of credit.” The Security Agreement also expressly stated that: ‘The letter ... of credit [is] subject to upward or downward adjustment in amount by [Liberty] at least annually to secure all Obligations relating to the [Policies] . . . [Liberty] may, at its sole discretion determine that the estimated amount of unpaid Obligations is greater than the amount of the existing letter of credit, and, if so, [Liberty] shall have the option to require [Gioioso] to deliver ... an amendment to the existing letter of credit or an additional letter of credit.”
The Security Agreement had attached to it a Security Schedule (Schedule) that was “incorporated into and made a part of the [Security Agreement].” The Schedule also provided that: “It is expressly understood and agreed that the amount of collateral . . . referenced on this Schedule may be adjusted at the sole discretion of [Liberty] to reflect then-current obligations.” The amount of the security stated on this final, 2009 Schedule was $2.2 million. The manner by which Liberty was to determine the amount of the “then-current Obligations” is not set out in the Security Agreement or the Schedule.
The Security Agreement further provided that Gioioso “will pay ... any and all reasonable expenses, including without limitation, reasonable legal fees and expenses . .. which [Liberty] may incur in connection with (a) the exercise or enforcement of any of the rights or remedies of [Liberty] hereunder and/or; (b) the failure of [Gioioso] to perform or observe any of the provisions hereof.”
Although not directly relevant to any material fact necessary to resolve the pending motion, it appears that Gioioso was unhappy with the amount of the letters of credit that it had to post after it began purchasing high deductible policies. At the end of the 2010 policy year, Gioioso, with the assistance of its insurance broker, purchased insurance from another carrier. Gioioso apparently thought that not renewing insurance with Liberty would cause the amount of his letter of credit to be immediately reduced. In an email exchange with Gioioso’s broker, Liberty advised that this was likely not the case:
Former customers do not receive liquidation credit[2] in the security calculation the way that current policyholders with reasonably good credit scores do. I think this reflects a perspective that we need to be more conservative about security when we no longer have an ongoing relationship with the other party ... The liquidation credit makes the assumption that we will continue to be reimbursed for paid losses and Variable Expense through the coming year. The more conservative approach makes no such assumption. From our perspective, the current policyholder with good credit gets a break in the security calculation. The former customer does not get that break . . . Normally, in such cases, I haven’t seen a reduction [in the amount of the letter of credit] in the first year.
In fact, the amount of the letter of credit required by Liberty in the Fall of 2010 was the same as the Fall of 2009: $2.2 million.
The amount of the letters of credit required under the Security Agreement were actuarially determined based on the insured’s, in this case Gioioso’s, claims history, by year and line of insurance, but limited to $300,000 for each loss, the deductible amount—as Liberty would be responsible for claims in excess of that amount. The sums so determined were multiplied by “loss development factors” (LDFs).[3] These LDFs are developed by Liberty’s actuaries based on claims experience generated over many years by many Liberty insureds across the United States.[4] The amount of the actuarially predicted loss falling within the deductible amount was then reduced by the sum that the insured had already paid to Liberty. The purpose of these calculations was to provide a statistically supported approximation of the amount that an insured would pay to Liberty from the date of the estimate until the last payment was due from any open policy, having in mind that there may have been occurrences during the years the policies were in force that have not yet resulted in claims and closed claims that may reopen.
The predicted sums that Gioioso would owe to Liberty over the life the policies were calculated in the Fall of 2011 and 2012, and then twice annually during the period running from 2013 through the Fall of 2015 (the last calculation completed prior to the filing of the pending motion for summary judgment). The amounts so calculated ranged from a high of $7.6 million in 2012 to a low of $7.1 million in the Fall of 2015. The amount of the required letter of credit, however, was reduced at each interval as Gioioso regularly paid Liberty amounts due under the policies for sums that Liberty was paying to claimants. As of the Fall of 2015, Gioioso had paid Liberty a total of $6.91 million,[5] and Liberty’s actuaries anticipated that it would pay another $223,000[6] before all claims on all policies were closed.[7]
Facts Relating to the Retrospectively Rated Policy
Under the terms of the commercial general liability policy in effect for 2004-2005, “[Liberty] will have the right and duty to defend the insured against any suits seeking damages.” Further, Liberty “may at [its] discretion, investigate any occurrence and settle any claim or suit that may result.” A claim was made against Liberty by the First Baptist Church apparently in connection with excavating work performed by Gioioso. Liberty assumed the defense of that suit which went to trial. (The First Baptist Litigation.) A juiy returned a verdict against Gioioso and judgment entered against it for $354,000, and a notice of appeal was filed. Liberty sent the claim file and trial record to *514 another law firm, i.e., lawyers independent from the lawyer that represented Gioioso at trial, for an opinion concerning the likelihood that a successful appeal could be pursued. That firm opined that the likelihood of success on appeal was between 5% and 10%. Liberty then settled the claim, while the appeal was pending, over Gioioso’s objection—Gioioso insisted that the appeal be prosecuted. As a result of the settlement, assuming Liberty was entitled to resolve the claim over Gioioso’s objection, under the terms of the policy, Gioioso was obligated to pay Liberty $112,997.[8]
DISCUSSION
The Summary Judgment Standard
Summary judgment is granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983). When reviewing a motion for summary judgment, the court considers the evidence presented in the light most favorable to the non-moving party. Flynn v. Boston, 59 Mass.App.Ct. 490, 491 (2003). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles it to a judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Importantly, “all evidentiary inferences must be resolved in favor of the [nonmoving party].” Boyd v. National R.R. Passenger Corp., 446 Mass. 540, 544 (2006).
The nonmoving party, however, cannot defeat a motion for summary judgment by merely asserting that facts are disputed. Mass.R.Civ.P. 56(e); LaLonde v. Eissner, 405 Mass. 207, 209 (1989). Rather, to defeat summary judgment, the nonmoving party must “go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.” Kourouvcucilis v. General Motors Corp., 410 Mass. 706, 714 (1991). “Conclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient.” Cullen Enters., Inc. v. Massachusetts Prop. Ins. Underwriting Ass’n, 399 Mass. 886, 890 (1987), quoting Madsen v. Erwin, 395 Mass. 715, 721 (1985).
Counts I and II of the Complaint
An insurance contract, like any other contract, is to be construed according to the fair and reasonable meaning of its words. See Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146 (1982). In consequence, even if the Security Agreement is considered to be a part of the high deductible insurance policy issued to Gioioso, where its terms are straightforward and unambiguous they must be applied according to their normal meaning. See Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992). Under the Security Agreement and the Schedule that is incorporated into it “the amount of collateral. . . may be adjusted at the sole discretion of [Liberty] to reflect then-current obligations.”[9] Liberty therefore did not breach any express contract term in determining “at its sole discretion” the estimated amount that Gioioso would have to pay it over the life of the policies.
However, “[e]veiy contract implies good faith and fair dealing between the parties to it.” Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471 (1991) (Anthony’s). In Anthony’s, the Supreme Judicial Court (SJC) explained that “use of a discretionary right under [an agreement] as a pretext” will support a finding that the covenant of good faith and fair dealing has been breached. In so holding, the SJC cited E.A. Farnsworth, Contracts §7.17(a), at 329 (1990) (“It is, therefore, bad faith to use discretion ‘to recapture opportunities forgone on contracting’ as determined by the other party’s reasonable expectations—to refuse ‘to pay the expected cost of performance,’ ” quoting Burton, Breach of Contract and the Common Law Duly to Perform in Good Faith, 94 Harv.L.Rev. 369, 369, 372-73 [1980]). The Delaware Chancery Court has even more directly addressed the effect of the covenant on contracts that grant one party the discretion to take action in the future: “The implied covenant is particularly important in contracts that endow one party with discretion in performance; Le., in contracts that defer a decision at the time of contracting and empower one party to make that decision later” and “requires that the discretion-exercising party make that decision in good faith.” Amirsaleh v. Board of Trade of City of N.Y., Inc., 2008 Del.Ch. LEXIS 131 at *30 (Del.Ch. Sept. 11, 2008).
Applying this principle to the Policies and the Security Agreement, Liberty had an obligation to act in good faith in setting the amount of the letter of credit. Gioioso’s first obstacle to establishing that there exists some material fact in dispute with respect to Liberty’s “good faith,” is that unlike the Anthony’s case, and the other cases and commentary on this subject, there is nothing in the summary judgment record that supports a reasonable inference that Liberty used its “discretion” as pretext to gain some advantage to which it was not entitled under the policies or the Security Agreement. Liberty received no economic advantage by asking for collateral in an amount in excess of what it reasonably believed was required to secure Gioioso’s future financial obligations to it.[10]
Moreover, Liberty produced the report of a qualified expert, actuary that Liberty’s methodology for estimating future losses on the Policies was standard in the industry and the LDFs that it employed were actually more beneficial to insureds than those used by other casualty insurers. In response to this expert report, Gioioso offered two affidavits: one from an accountant, not an actuary, who appears to focus on business valuation and whose CV does not reflect any experience with the insurance industry, and the other from Gioioso’s controller.[11] The court has reviewed these affidavits and finds that they do not raise a material question of fact regarding Liberty’s good faith in determining the amount of estimated future payments that Gioioso will owe Liberty. Indeed, the court has had *515 difficulty understanding the point being made in the affidavits, but it is clear that neither suggests that Liberty did not use a reasonable methodology generally accepted in the insurance industry to estimate the future payments that may become due.[12] The possibility that someone who is not an actuary and never been engaged to model future claims based on the claims history of numerous insureds over many years and several lines of insurance might have estimated future losses in a different manner does not create a triable issue of fact on the question of whether Liberty acted in good faith in exercising its discretion as to the required amounts of the letters of credit.
Gioioso also argues that Liberty acted in bad faith by not disclosing that insureds that did not renew their policies with Liberty would not be entitled to the benefit of “liquidation credits.” While it might be better practice for Liberty to explain its use of liquidation credits to its insureds when they decide to purchase high deductible policies, its failure to do so does not establish that it acted in bad faith when it estimated the amount of future payments anticipated to be due under the policies. The Security Agreement was clear in stating that collateral would be required in an amount equal to the anticipated losses that the insured would be required to reimburse Liberty because it had chosen a high deductible “occurrence” policy. The fact that Liberty was willing to be undersecured with respect to existing policy holders that had good credit, does not tend to prove that it acted in bad faith in exercising its discretion to demand full security from former policyholders with respect to which it would have no ongoing relationship, but would nonetheless be required to pay all claims arising under these occurrence policies and then seek reimbursement from its former insured.
In summary, Liberty did not breach any express term of the policies or the Security Agreement when it exercised its discretion in determining the amount of estimated future payments due it and demanding a letter of credit in that amount; and, the summary judgment record contains no evidence creating a disputed issue of fact with respect to whether Liberty acted in good faith in exercising its discretion.
Count III of the Complaint
In Count III, Gioioso asserts a claim for breach of fiduciary duty against Liberty. However, “[t]he relationship of insurer and policy holder does not entail a fiduciary duty absent special circumstances of assertion, representation andreliance.” Szymanski v. Boston Mutual Life Ins. Co., 56 Mass.App.Ct. 367, 381 (2002) (internal quotations and citations omitted). No such special circumstances exist in this case. Gioioso is a company in the excavation business that generates substantial annual revenue. It was represented by a large, national firm of insurance brokers in selecting its insurance program. With the assistance of its broker it elected a high deductible policy. The relationship between Gioioso and Liberty, as it relates to the claims asserted in this case, was that of counterparties to a contract.
Count IV of the Complaint
In Count IV, Gioioso asserts a claim for violation of G.L.c. 93A, §11. Having found no breach of contract, breach of the implied covenant of good faith and fair dealing, and no fiduciary relationship between Gioioso and Liberty, the Chapter 93A claim must also be dismissed.[13]
Count I of the Counterclaim
In Count I of its Counterclaim, Liberty seeks to recover the sum it asserts it is due, $112,997, as a consequence of its paying the judgment entered in the First Baptist litigation. Liberty paid that judgment and dismissed the appeal, over Gioioso’s objection, based on an opinion by a law firm that the appeal had only a 5% to 10% chance of success. Gioioso maintains that it has no obligation to make a payment to Liberty as a consequence of the payment of the judgment because Liberty’s duly to defend included a duty to prosecute the appeal, which Liberty breached.
Gioioso supports its argument by citation to Davis v. Allstate Ins. Co., 434 Mass. 174 (2001). There the SJC stated;
Allstate’s decision whether to appeal the judgment was governed by the established rule that an insurer’s duly to defend generally encompasses an obligation to appeal from an adverse judgment against its insured, but only if reasonable grounds exist to believe that the insured’s interest might be served by the appeal. See Aetna Cas. & Sur. Co. v. Sullivan, supra at 157 n.3; Chrestman v. United States Fid. & Guar. Co., 511 F.2d 129, 130 (5th Cir. 1975); Truck Ins. Exch. of Farmers Ins. Group v. Century Indem. Co., 76 Wash.App. 527, 533 (1995); Aetna Ins. Co. v. Borrell-Bigby Elec. Co., 541 So.2d 139, 141 (Fla.Dist.Ct.App. 1989); 7C J.A. Apple-man, Insurance Law and Practice §4688, at 200-01 (rev. 1979) (insurer “owes a duty to appeal in all instances where it appears the substantial interests of the insured maybe served”); 14 G. Couch, Insurance §200.48, at 220-118 (3d ed. 1999) (“insurer’s covenant to defend embraces the duly to prosecute an appeal from a judgment against an insured where there are reasonable grounds for appeal”).
Gioioso latches on to the statement from Couch quoted by the SJC—an insurer “owes a duty to appeal in all instances where it appears that substantial interests of the insured may be served”—and argues that since it would not be required to pay anything on the First Baptist claim if an appeal were successful, its interests would certainly be served by Liberty prosecuting an appeal. As Gioioso puts it: “If there is any likelihood whatsoever that an appeal might have resulted in a judgment for Gioioso as a matter of law, then clearly there were reasonable grounds to believe *516 that an appeal might serve Gioioso’s interest.” Gioioso’s Opposition at 32 (emphasis in original).
Liberty responds that the policy provided that Liberty “may at [its] discretion . .. settle any claim or suit ...” It therefore had the contractual authority to settle the First Baptist litigation. Additionally, under G.L.c. 176D, §3(9)(i), Liberty has the statutory obligation “to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.” Therefore, the discretion granted it under the policy coupled with the risk that it could be found to have engaged in an unfair claims settlement practice gave it the right to pay the claim.
The statement of these abstract principles is far easier than applying them to the facts of a given case; in particular, this case, where the economic burden of settlement does not fall entirely on the insurer or the insured, because the policy is retrospectively rated. There seems to be no dispute that the payment of the claim resulted in Gioioso incurring an additional premium expense of $112,997. It also appears that Liberty’s share of the payment to First Baptist was substantially in excess of the amount by which Gioioso’s retrospectively rated premium increased. This was, therefore, not a situation in which Liberty chose to pay a claim shifting the entire, or even the majority, of the financial burden to its insured. Clearly, if Liberty believed that an appeal would likely be successful, it would be to its advantage to pursue the appeal. What is not clear from the summary judgment record is what the respective costs would be to Gioioso and Liberty, if the appeal was prosecuted unsuccessfully with the result that additional legal fees were incurred and interest continued to accrue on the entire amount of the final judgment at 12%. Presumably, Gioioso’s costs under the retrospectively rated policy would be higher, but so would Liberty’s.
The court does not believe that the policy language quoted by Liberty would entitle it to settle any claim regardless of the economic impact on Gioioso. The duty to defend is not so easily cast off. On the other hand, the duty to defend cannot reasonably compel Liberty to pursue any appeal that has any conceivable chance of being successful. The three cases cited by the SJC in Davis in support of its ruling that there exists a duty to appeal “only if reasonable grounds exist to believe that the insured’s interest might be served by the appeal” are instructive. In Chrestman v. U.S. Fidelity & Guar. Co., 511 F.2d at 130, the Fifth Circuit, per curiam, stated; “At the very least under the authorities, [the insured] would be required to show reasonable grounds for taking an appeal,” and held that the insured had not met that burden. In Truck Ins. Exchange of Farmers Ins. Group v. Century Indem. Co., 887 P.2d at 459, a court of the Washington Appellate Division held that where “there are reasonable grounds to believe a substantial interest of the insured may be served” the duty to defend includes the duly to appeal. In that case, trial counsel opined that there was a “fertile area for appeal” because of error in the instruction on damages. The claims manager disagreed, but that raised a triable issue of fact on whether the insured had breached the duly to defend by refusing to prosecute the appeal. In Aetna Ins. Co. v. Borrell-Bigby Elec. Co., Inc., 541 So.2d at 141, a Florida appellate division court held that the duty to defend included the duty to appeal “where good faith grounds exist” and noted that Aetna’s counsel recommended appeal, but Aetna declined.
Turning to the instant case, the summary judgment record does not suggest a disputed issue of fact regarding the merits of an appeal. The court disagrees that a duty to appeal arises if there is only a 5% to 10% chance of success. Those minimal chances of success on appeal could be assigned to any case tried to completion. At a minimum, the insured must point to a particular appellate issue and explain why the trial court committed error and why this error was sufficiently prejudicial that judgment for the plaintiff might be reversed. The issue cannot be decided based on a percentage likelihood of success on appeal in the absence of some mathematically valid means of assigning such a percentage, and none was suggested in this case. Rather, a breach of the duty to defend could be established by identifying a material, prejudicial ruling and explaining the basis for arguing that it was erroneous. The record in this case contains nothing of that nature. To the contrary neither trial counsel nor secondary counsel retained to review the trial record suggested the existence of a potentially meritorious grounds for appeal. Summary judgment cannot be avoided by simply arguing that “any likelihood whatsoever” of success requires that an appeal be pursued.
In consequence, Gioioso breached its insurance contract by refusing to pay the additional amount due Liberty as a consequence of the payment of the First Baptist judgment.
Count II of the Counterclaim
In Count II of its Counterclaim, Liberty asserts that it is entitled to recover its attorneys fees and litigation expense incurred in defending Gioioso’s complaint and prosecuting its counterclaim. It bases its claim on the provision of the Security Agreement that states that “the Policyholder will pay . . . any and all reasonable expenses, including without limitation, reasonable legal fees and expenses . . . which [Liberty] may incur in connection with (a) the exercise or enforcement of any of the rights or remedies of [Liberty] hereunder and/or, (b) the failure of [Gioioso] to perform or observe any of the provisions hereof.”
The words “hereof’ and “hereunder” may logically be construed to apply to the Security Agreement. In consequence, this provision applies to costs that Liberty might incur if Gioioso failed to perform some obligation under the Security Agreement or, perhaps, took steps to prevent Liberty from drawing on a letter *517 of credit posted pursuant to it. None of that happened in this case. Gioioso provided letters of credit in the amount demanded by Liberty, including the $ 112,997 that Liberty asserted it was due under the 2004-2005 retrospectively rated policy. Moreover, Gioioso apparently paid all amounts due Liberty under the high deductible policies as they came due, and Liberty never attempted to draw against the letter of credit. This attorneys fees provision does not state that Liberty is entitled to recover attorneys fees incurred as a result of any dispute arising under the Policies, the Security Agreement, or the Schedule; it appears much narrower than that. At best, this attorneys fees provision in the Security Agreement is ambiguous as to its reach. Since the Security Agreement was executed as a condition to the issuance of the insurance policies, any ambiguity must be resolved against Liberty, as it would be in interpreting a term of the policy. See Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. at 146.
Summary judgment shall enter dismissing Count n of the Counterclaims. See Mass.R.Civ.P. 56(c) (“Summary judgment, when appropriate, may be rendered against the moving party”).
ORDER
For the foregoing reasons, Liberty’s motion for summary judgment is ALLOWED as to all claims asserted against it in the complaint; ALLOWED as to Count I of the counterclaim; and DENIED as to Count II of the counterclaim. Final Judgment shall enter dismissing the complaint; under Count I of the counterclaim, awarding Liberty the sum of $112,997 against Gioioso, plus interest from the date the counterclaim was filed; and dismissing Count II of the counterclaim. Liberty is awarded costs in respect of the complaint, and each party is to bear its own costs in relation to the counterclaim.

 The complaint includes a fifth count for injunctive relief, but that is a request for a remedy, nota separate cause of action.

 The liquidation credit is not referenced in the Security Agreement or Schedule. According to Liberty, this liquidation credit is the amount that Liberty expects an insured will pay to Liberty for some period—twelve months or less—on its current obligations. Existing customers with good credit may receive this benefit when the amount of the required letter of credit is calculated, but it is only applied to current customers. Gioioso was not aware of the “liquidation credit” until it was explained to his broker, when the broker was negotiating the 2010 renewal of the policies with Liberty and inquired about the amount of the letter of credit that would be required if Gioioso did not renew with Liberty.

 Liberty submitted the report of an expert actuary that described in greater detail how the different LDFs are established and applied to an insured’s individual claim history to arrive at a predicted loss for all open policy years. For the purposes of the pending motion, it is not necessary to provide any further description of this process.

 LDFs are considered proprietary by Liberty (other casualty insurers similarly treat their own LDFs as confidential) but were produced to Gioioso during discovery pursuant to a confidentiality agreement.

 This sum Includes premium payments paid while the policies were in force. It may be noted that Liberty has paid $5.7 million in unreimbursed claims, le., on claims that exceeded $300,000. The amount, if any, by which this $5.7 million exceeded premiums received is not disclosed in the summary judgment record.

 Beginning in 2014, after the judgment was paid on the 2004 claim, Liberty began to add the $112,997 that it maintained it was due as a consequence of that payment under the terms of the retrospectively rated policy that covered that claim.

 Gioioso argues that the actuarial calculation exceeded the amount of reserves established on all open claims. The reserves are, however, set by individual claim adjusters and do not reflect the statistical analysis of the actuaries. They would also not account for incurred but unreported losses or the statistical likelihood that some closed claims would be reopened because of unforeseen medical complications or other events.

 The record is unclear as to whether Liberty paid the entire amount of the judgment or negotiated some lesser sum in return for dismissing the appeal. For simplicity, the court will refer to the resolution of the First Baptist claim as the payment of the judgment. In any event, Gioioso does not argue that the $112,997 was improperly calculated, assuming that Liberty was entitled to pay the judgment.

 Elsewhere the Security Agreement also provides that “[Liberty] may, at its sole discretion determine that the estimated amount of unpaid Obligations is greater than the amount of the existing letter of credit, and, if so, [Liberty] shall have the option to require [Gioioso] to deliver... an amendment to the existing letter of credit or an additional letter of credit.”

 During the course of pretrial discovery, Gioioso argued that Liberty could improve its financial reporting position by increasing the amount of the letters of credit that it required its insureds to post. Gioioso was, however, unable to produce any support for its theory.

 Liberty has moved to strike these affidavits as they offer opinions and were first served on Liberty in opposition to the motion for summaiy judgment long after the date required for expert reports and well after discovery closed. Liberty points out that it had no opportunity to depose these affiants. As a consequence of the court’s rulings, Liberty was notprejudiced by the untimely submission of these affidavits.

 Gioioso complains that Liberty used data generated from its insureds across the United States rather than in New England in developing LDFs. But there is nothing in the record that suggests that Liberty acted in bad faith in using that data base or that this was not industry standard.

 Liberiy also asserts that there is nothing in the sum-maiy judgment record establishing that Gioioso suffered any damage as a consequence of Liberty asking for a letter of credit in an allegedly overstated amount, other than the 1% of that excess amount that a financial institution generally charges its customers for issuing an irrevocable letter of credit. According to Liberty that amount would not nearly meet the jurisdictional minimum for an action to be prosecuted in the Superior Court. The court does not reach that argument.